Filed 6/10/22  In re J.C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | B314696 (Los Angeles County Super. Ct. No. 19CCJP01343A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>S.P.,<br><br>     Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>CHANGE IN JUDGMENT |

THE COURT:

      The opinion filed herein on May 20, 2022, is modified as follows:

1.     On pages 26 and 27, the second through fourth sentences of the Disposition paragraph are deleted and replaced with the following language:

> We remand to the juvenile court for the Department and the court to comply with the inquiry—and, if applicable, notice—provisions of ICWA and California law consistent with this opinion, including inquiring of the maternal extended family members.  After ensuring the Department has complied with the inquiry—and, if applicable, notice— provisions of ICWA and California law, the juvenile court shall determine whether son is an Indian child.  If the juvenile court determines son is not an Indian child, the order terminating parental rights shall remain the order of the court.  If the juvenile court determines son is an Indian child and ICWA applies, the court shall vacate the order terminating mother's and father's parental rights and proceed consistent with ICWA and California law.

Accordingly, the Disposition paragraph on pages 26 and 27 now reads in full:

> The August 17, 2021 order is conditionally affirmed.  We remand to the juvenile court for the Department and the court to comply with the inquiry—and, if applicable, notice—provisions of ICWA and California law consistent with this opinion, including inquiring of the maternal extended family members.  After ensuring the Department has complied with the inquiry—and, if applicable, notice—provisions of ICWA and California law, the juvenile court shall determine whether son is an Indian child.  If the juvenile court determines son is not an Indian child, the order terminating parental rights shall remain the order of the court.

If the juvenile court determines son is an Indian child and ICWA applies, the court shall vacate the order terminating mother's and father's parental rights and proceed consistent with ICWA and California law.

This modification order changes the judgment.

Respondent's petition for rehearing is denied.

NOT TO BE PUBLISHED.

LUI, P. J.          ASHMANN-GERST, J.          HOFFSTADT, J.

Filed 5/20/22  In re J.C. CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | B314696 (Los Angeles County Super. Ct. No. 19CCJP01343A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>S.P.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Tamara E. Hall, Judge.  Conditionally affirmed and remanded with directions.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, S.P. (mother) challenges the juvenile court's order terminating her parental rights to her 3-year-old son J.C. (son). Mother makes two arguments on appeal. First, she argues the juvenile court erred when it refused to apply the beneficial parental relationship exception to termination of parental rights. We conclude both that the juvenile court did not run afoul of our Supreme Court's recent decision addressing this exception to the termination of parental rights (*In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*)) and that substantial evidence supports the juvenile court's decision.

Second, mother argues the order terminating parental rights must be reversed because the Los Angeles County Department of Children and Family Services (Department) and the juvenile court failed to satisfy their initial inquiry obligations under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq. (ICWA)) and related California law. In particular, mother claims the Department failed to ask extended family members if son is or may be an Indian Child and, therefore, the juvenile court's order finding ICWA inapplicable is not supported by substantial evidence. We agree with mother that the Department and the juvenile court erred under ICWA and that those errors were prejudicial.

2

Accordingly, we conditionally affirm the juvenile court's order terminating parental rights and remand for the juvenile court and the Department to comply expeditiously with their initial inquiry obligations under ICWA and California law.

## BACKGROUND

### 1. The Family

When the underlying proceedings began, mother was a minor dependent of the juvenile court living in a group home. She entered foster care when she was 14 years old and lived with a foster family until she became pregnant with son. When mother was approximately 17 years old, her mother died after having a stroke. Mother has three sisters, with whom she has supportive relationships.

Mother gave birth to son while she was a minor dependent of the court. Son is her first child. When the underlying proceedings began, mother was two months pregnant with her second child, and when her parental rights to son were terminated she was pregnant again. Son is the only child involved in this appeal.

Son's father, N.C. (father), also was a minor when son was born. When the underlying proceedings began, father was a ward of the juvenile court on mandatory supervision for possessing narcotics on school property. His whereabouts were unknown, he was believed to be homeless, and a juvenile warrant had been issued for him. For much of the underlying proceedings, father was incarcerated. His mother raised him until he was five years old, at which time his great grandmother took legal guardianship of him and his older brothers. Father is not a party to this appeal.

3

Both mother and father have a history of drug abuse. Mother was diagnosed with and prescribed medication for depression and ADHD. At some point, mother stopped taking medication but participated in therapy.

## 2. Petition and Detention

In February 2019 when son was 10 months old and in his stroller with mother, mother engaged in a physical altercation with other residents of the group home where she lived. As a result, mother was taken to the hospital. Father picked up son and dropped him off with father's mother (paternal grandmother) at the home of father's grandmother (paternal great grandmother). Father left no provisions or plan for son's support. Paternal grandmother did not know where father went after he left son with her and did not know how to contact father or mother. Because neither parent could be located, son was detained and placed in a foster home.

On March 1, 2019, the Department filed a Welfare and Institutions Code section 300 petition on behalf of son (petition).[1] The petition's six counts were brought under section 300 subdivisions (a), serious physical harm, and (b), failure to protect. The counts alleged son was at risk of serious physical harm due to mother's history of violent altercations in son's presence, mother's mental and emotional problems, including depression, and her failure to take her medication as prescribed, mother and father's history of substance abuse and their current abuse of marijuana, and father's failure to make a plan for son's care and supervision. The petition also included ICWA form-010, which

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

4

indicated mother had been asked about Indian ancestry and had "[d]enied any Native American Ancestry in the family."

Mother was present at the detention hearing, which was held a few days later. Father did not appear. At the hearing, the juvenile court ordered son detained and ordered monitored visits for both parents. The court noted mother had completed her "parental notification of Indian status" form (ICWA-020), on which she checked the box stating, "I have no Indian ancestry as far as I know." The court asked mother and paternal relatives who were present whether father had any American Indian ancestry. One or two unidentified paternal relatives responded, "No, he doesn't." The court found it had "no reason to know that ICWA applies to this matter" at the time. The court's minute order from the detention hearing stated, "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep the Department, their Attorney and the Court aware of any new information relating to possible ICWA status."

In late March 2019, father signed and filed his "parental notice of Indian status" form (ICWA-020), on which he also checked the box indicating he had "no Indian ancestry as far as I know." At the March 27, 2019 arraignment hearing for father (for which both mother and father were present), the juvenile court stated, "I have paperwork from the father stating that he does not have Indian ancestry and the mother has no Indian ancestry; right? American Indian ancestry?" Counsel for mother responded, "The paperwork submitted at the detention hearing, we had indicated that she does not." The juvenile court then found "ICWA does not apply in this case." The court's minute

5

order for the March 27 hearing stated, "The court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA."  The court ordered mother and father to advise the Department, court, and their attorneys of any new information related to their ICWA status.

As part of the Department's continued investigation, a Department social worker spoke with, among others, paternal great grandmother.  Paternal great grandmother indicated father had serious substance abuse issues and often engaged in arguments with mother.

### 3.    Adjudication, Disposition, and Reunification

The jurisdiction hearing was held in April 2019.  Both mother and father attended the hearing.  At the time, son was placed with mother's former foster parents, with whom mother had maintained a close relationship.  The juvenile court amended the petition and mother entered a plea of no contest.  The court sustained four of the counts based on mother and father's failure to protect son related to mother's violent altercations, father's failure to make an appropriate plan for son, and both parents' substance abuse.  The court dismissed the remaining counts.  The juvenile court declared son a dependent of the court and continued its detention order.

The disposition hearing was held in June 2019.  Both mother and father were present.  The juvenile court ordered son removed from mother and father's custody.  The court ordered mother to submit to weekly random or on-demand drug testing and to participate in a substance abuse education program, parenting program, anger management, and individual counseling.  Mother also was granted monitored visits with son.

In July 2019, son was replaced into the home of maternal aunt and her husband.

In September 2019, mother gave birth to her second child, another son (younger son). Her younger son was not a dependent of the court and mother cared for him while living at her group home. When her younger son was two months old, it was reported mother had "been doing a good job taking care of [her younger son] and is very attentive to him." By that time, mother also had enrolled in all court-ordered services and her visits with son had progressed to overnight visits with no concerns.

At a December 2019 review hearing, the juvenile court found mother's progress in her case plan had been "substantial." On the Department's recommendation, the juvenile court ordered son returned to mother's custody and care with family maintenance services in place.

## 4. Subsequent Petitions, Removal, and Reunification Period

In a status report filed May 22, 2020, the Department reported, "within the last couple months mother appears to have been gradually spiraling out of control." The Department stated, among other things, mother stopped drug testing, again began displaying aggressive behavior toward peers both verbally and physically, would be away without leave and not inform the Department of her whereabouts, did not follow the rules of her group home, and participated in a drug deal during which she attempted to pay for drugs with fake money and her car was "shot up." Although mother had missed many drug tests and two of her more recent tests were positive for marijuana, mother denied any substance abuse and denied being involved in a drug deal. Nonetheless, mother appeared to be attentive to her

children, had a strong relationship with son, and had been consistent with her parenting classes.

The following week, the Department filed and the juvenile court granted an application for the removal of son and his younger brother from mother's care. In its application, the Department stated that a few weeks earlier, mother had been found unresponsive in her car while her two young children were in the back seat. Paramedics were called and administered Narcan to mother, who regained consciousness and was taken to an emergency room. Mother told doctors at the hospital she had taken one Tylenol oxycodone that night. Later, however, when speaking with a Department social worker, mother denied taking anything other than Motrin and insisted she passed out in her car because she had a headache. She refused medical treatment at the hospital and walked out when the doctor left her alone. She was diagnosed with an accidental oxycodone overdose. In its application for removal, the Department also noted mother recently had tested positive for marijuana and was driving with her children "in a car without a license, insurance, or car registration." The Department detained the children and placed them with mother's former foster parents (collectively, caregivers), with whom son already had spent some time and with whom mother maintained a positive relationship.

A few days later, on June 2, 2020, the Department filed a section 342 subsequent petition and a section 387 supplemental petition on behalf of son.[2] The one-count subsequent petition

_____

[2] The Department also filed a section 300 petition on behalf of mother's younger son, who was not yet a dependent of the court. Because her younger son is not a party to this appeal we discuss that case only to the extent relevant.

8

alleged son was at risk of harm under subdivision (b) of section 300 due to mother's mental and emotional problems. In the supplemental petition, the Department requested a more restrictive placement for son based on mother's alleged drug use, including her oxycodone overdose in son's presence and failure to drug test as ordered by the court.

At the initial hearing on the new petitions (for which mother but not father appeared), the juvenile court detained both children from mother and ordered them to remain placed with the caregivers. Mother was granted monitored visits with her children. The court also reviewed the parents' earlier ICWA forms, through which they each had denied Indian ancestry. The court again held ICWA did not apply.

In late June 2020, the day before her 19th birthday, mother was discharged from her group home because she was "coming of age." She indicated her desire to participate in a transitional housing program.

In July 2020, the juvenile court sustained the section 387 supplemental petition (regarding mother's drug use and failure to test). The court dismissed the section 342 subsequent petition (regarding mother's alleged mental and emotional problems). The court declared mother's younger son a dependent of the court and ordered both children removed from mother. They remained placed with the caregivers, i.e., mother's former foster parents. The court ordered mother to submit to weekly drug testing, a drug and alcohol program, individual counseling, and a psychological assessment. Mother was granted monitored visitation generally and unmonitored visits in the home of the caregivers.

In an August 2020 report for the court, the Department reported mother struggled to find housing and at times was difficult to contact. Although the Department was working with mother to find transitional housing, significant challenges existed in that many programs were not taking applicants due to the Covid-19 pandemic, and mother lacked follow through and refused to accept support. Mother continued to skip her court-ordered drug testing and it did not appear she had enrolled in a substance abuse education program. Since leaving her group home, mother no longer participated in anger management classes, but she continued, albeit inconsistently, with individual therapy. Because mother was difficult to contact, the Department asked the juvenile court to appoint caregivers as partial educational rights holders for son so "critical services" for son could be obtained in a timely manner. This report does not address mother's visits.

**5.      Termination of Reunification Services**

In September 2020, the juvenile court terminated mother's reunification services and set the matter for a permanency planning hearing.

The following month, mother enrolled in a substance abuse program, which included random drug testing, group therapy, and individual counseling. Approximately one month later, however, mother was discharged from the program for lack of consistent participation. Although the Department had provided mother with additional referrals for court-ordered programs, by February 2021, she had not enrolled in any. Nonetheless, mother continued to attend weekly individual counseling sessions. In April 2021, after mother was found in a car with her current

boyfriend and a loaded weapon, she was arrested for carrying a concealed weapon.

In December 2020, the Department reported son "continues [to] thrive in the home of the [caregivers]" and had developed "a close bond and attachment to" them. The caregivers stated they "have a family like relationship" with son and his younger brother, both of whom the caregivers wanted to adopt if mother and father failed to reunify with them. The Department also reported that, although mother continued to visit with son, her visits were "not consistent at this time." When mother did visit, the caregivers reported her visits were appropriate.

In February 2021, the Department again reported son was "comfortable and happy around caregivers and appears to have a close bond with [them]." The caregivers reported mother had monitored visits with the children at their home. Because of the Covid-19 pandemic, she saw the children less, but called or had video chats with them when possible. At some point, mother was able to resume regular monitored visits on weekends. Her visits were appropriate and "the children enjoy spending time with their mother."

The Department consistently reported the caregivers wanted to adopt son. The caregiver husband told a Department social worker, " 'We want what is best for the children. We are ready to proceed with adoption. My wife is in agreement as well. We love the children and treat them like our grandchildren.' " The husband also noted that, in the past, "his family had tried to help [mother] change but everything was in vain" and "because of experiences with [mother], he was uncertain if she would indeed change." The husband also stated, " 'We feel like the children are our family. I feel like I'm their grandfather. We want the best

11

for them. I wouldn't want them to live in another foster home or not be safe somewhere else.' "

In August 2021, the Department filed a report for the court regarding son's younger brother, which report the juvenile court admitted without objection as an exhibit for son's permanency planning hearing. In that report, the Department stated mother "has not been in compliance with the court ordered services [in her younger son's case] . . . . Mother has not kept contact with the department as her phone has been disconnected causing issues with contacting her. Mother throughout this period of supervision [February 2021 to August 2021] has changed her number roughly 3 times and has failed to provide [the Department social worker] with an updated contact. Mother has not provided [the social worker] with information as to where she is staying or living. Mother's lack of communication and transparency have made supporting her through her case plan difficult as [the social worker] is unable to locate or reach her via phone. [¶] . . . [M]other has not enrolled into any other program to comply with her court ordered services [as to her younger son]." The Department also reported mother had failed to follow through with housing referrals, missed almost all of her court-ordered drug tests, was "homeless and sleeps at her friend's house," and was pregnant with her third child.

The Department also reported mother's visits with her children were inconsistent. When mother did visit, the caregivers supervised, the visits went well, and there were no concerns. The Department also noted, however, "Mother is not consistent with her visitation and will go weeks without visiting or calling the children." In May 2021, mother told a Department social worker "she had stopped visiting the children regularly and she was

12

avoiding contact with people because she was going through a lot. Mother reported she would only send the children gifts via mail. Mother reported she was 'up to no good because I was dealing with things.' " The Department stated, "Mother has a tendency of not visiting the children when she is dealing with an emotional stressor. Not visiting the children consistently causes the children to question the caregiver as to the mother's next visit and when she will be coming to see them." There was no report of mother visiting her children after May 2021.

In its August 2021 report, the Department assessed the younger son's risk to be "high" if returned to his parents' care. The Department asked the juvenile court to terminate mother and father's reunification services as to their younger son. Among other things, the Department noted mother had "shared wanting her children . . . to be adopted by the caregiver so the case can close and the baby she is expecting is not removed from her care." The Department also explained, "Mother is currently expecting her third child and is already engaging in concerning behaviors. Mother is not ensuring her safety let alone the safety of her unborn child by driving in a car with a loaded gun. Mother's decisions are of concern as she is not demonstrating her ability to care for her children or wanting to provide her children with a safe or stable environment. Instead mother is engaging in criminal activity and not testing for the department."

**6.     Termination of Parental Rights**

Son's permanency planning hearing was held on August 17, 2021.

At the hearing, counsel for mother asked the juvenile court either to grant mother more time because mother was "turning her life around and very much does wish to continue her role as

[son's] mother" or to find the beneficial parental relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) existed. Counsel represented that, for the past two months, mother had resumed visiting her children at the caregivers' home "about two times a week." According to counsel, mother had confirmed "she was going through a difficult emotional time [when she stopped visiting her children] and she simply did not want her children to see her like that." Counsel also noted mother was very close with the caregivers, stating "[s]he calls them mom and dad herself."

On the other hand, counsel for the Department and for son urged the court to terminate parental rights to son. Counsel for the Department argued there was "no parent-child bond" between mother and son that would prevent the court from terminating her parental rights as to son. Counsel stated mother "does not take a parental role in [son's] life. The primary caretaking role is taken by the caretakers." Counsel for son similarly noted that, although "mother does visit [son], the benefits of adoption outweigh the connection. [Son] is just three years old. He's lived with the current caregivers for the majority of his life."

At the conclusion of the hearing, the juvenile court found no exception to adoption existed. Among other things, the court noted mother had been unable to stabilize her life, had stopped visiting her children, and when she did visit "it was more of a friendship as opposed to a parental role." The court also considered and relied on the arguments made by counsel for the Department and son. The court found mother "has not maintained regular visitation with [son] and has not established a bond with [son]" and "any benefit accruing to [son] from [his] relationship with [mother] is outweighed by the physical and

14

emotional benefit [son] will receive through the permanency and stability of adoption, and that adoption is in the best interests of [son]." Accordingly, the court terminated mother and father's parental rights as to son. The court designated caregivers as son's prospective adoptive parents.

ICWA was neither raised nor discussed at the hearing.

### 7.    Appeal

Mother appealed the juvenile court's findings and orders made at the permanency planning hearing.

### DISCUSSION

Mother makes two arguments on appeal. First, she argues the juvenile court erred when it determined she could not claim the beneficial parental relationship exception to termination of parental rights. Second, mother argues the Department and the juvenile court committed reversible error by failing to satisfy their initial duty of inquiry under ICWA and related California law. We address each argument in turn.

### 1.    Beneficial Parental Relationship Exception

#### a.    *Applicable Law*

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies. (§ 366.26, subds. (b) & (c)(1).) Here, it is undisputed son was likely to be adopted. Thus, our focus is whether a statutory exception to the termination of parental rights applies.

The exception mother raises is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides: "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would

15

be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

As our Supreme Court recently explained, to establish this exception, the parent must prove the following three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.) The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

**b.** ***Standard of Review***

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review. On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception]. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the

16

relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion. As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in

17

the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### c. *The juvenile court did not err in determining the beneficial parental relationship exception did not apply.*

Mother argues the juvenile court erred in assessing the first element of the beneficial parental relationship exception. In particular, she claims the court improperly found she had "stopped" visiting son and had not maintained regular and consistent visitation.

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

We conclude substantial evidence supports the juvenile court's finding that mother did not maintain regular and consistent visitation. Although the record reveals mother's visits with son were positive, the record also reveals her visits were not consistent. The inconsistency of mother's visits is supported both by the caregivers' statements and mother's own statements. At the time of the permanency planning hearing as well as in a

18

report dated approximately eight months earlier, the evidence was that mother's visits were inconsistent. Further, it was undisputed she had stopped visiting her children a few months before the permanency planning hearing. There was no evidence she resumed visiting her children, let alone consistently. Although at the permanency planning hearing mother's counsel stated mother had resumed regular visits with son, the parties agree statements by counsel are not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11.) To the extent mother points to evidence in the record supporting her position on appeal, it is not our role to " 'reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Nonetheless, even if the court's finding on the first element was not supported by substantial evidence and mother did in fact maintain regular and consistent visits with son, the beneficial parental relationship exception still would not apply because mother failed to prove the third element.[3] In other words, it was not an abuse of discretion to conclude the benefits to son of an adoptive home outweighed the harm from terminating mother's parental rights. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632.)

On the one hand, the evidence amply supports a finding that son would benefit from adoption by the caregivers. For example, son was three years old at the time of the permanency planning hearing, he had lived a majority of his young life outside of mother's care, including more than one year in the caregivers' home. The caregivers were willing to adopt son, were bonded

---

[3] We assume mother met the second element—i.e., son would benefit from continuation of his relationship with mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

with him, and already considered him a member of their family. On the other hand, son enjoyed his visits with mother and presumably would suffer some detriment if he no longer saw her. It was reported he would ask about mother when she failed to visit.

However, despite the two-and-a-half-year length of the underlying proceedings, mother had been unable to alleviate issues that contributed both to her inability to visit son regularly as well as her inability to care for him. Mother stated she stopped visiting her children because she had been " 'dealing with things' " and "was going through a lot." The Department stated, "Mother has a tendency of not visiting the children when she is dealing with an emotional stressor." As the juvenile court stated at the permanency planning hearing, mother continued to struggle with stabilizing her life. For example, the record reveals mother continued to use drugs, engaged in criminal activity, and repeatedly failed to follow through with viable housing options (thus, leaving her homeless). Of course, any one of these issues let alone all of them together constitute emotional stressors. Perhaps most telling, mother told a Department social worker in May 2021, a few months before her parental rights were terminated, that she wanted the caregivers to adopt son so that the case would be closed and the child she was then-expecting would not be removed from her.

Thus, given on the one hand the stability and permanence offered by the caregivers and, on the other hand, mother's consistently unstable lifestyle which interfered with her ability to maintain a consistent relationship with son and her seemingly callous attitude toward son's adoption, we conclude the juvenile court did not abuse its discretion in determining the harm to son

in losing his relationship with mother did not outweigh the benefits to son of placement in the adoptive home with the caregivers.  (*Caden C., supra,* 11 Cal.5th at p. 640.)

Relying on *Caden C.*, mother argues the court erred when, in rejecting the beneficial parental relationship exception, it relied on "inapplicable" factors, such as mother's noncompliance with her case plan, the notions mother "had not changed" and her life was unstable, her visits had stopped, and her visits were "more of a friendship as opposed to a parental role."  Mother misreads our Supreme Court's ruling in *Caden C.*  Contrary to mother's position, *Caden C.* does not prohibit a juvenile court from considering "a parent's continued struggles with the issues that led to dependency."  Rather, our Supreme Court stated those issues may not be used as "a categorical bar to applying the exception," but can be relevant to the juvenile court's decision. (*Caden C., supra*, 11 Cal.5th p. 637.)  "Though there is no reason for a court to consider 'a second time' the same struggles in the same way, a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental."  (*Id.* at p. 639.)

As noted above, the juvenile court here did not categorically bar application of the beneficial parental relationship exception simply because mother had not sufficiently addressed the issues that led to the court excising its jurisdiction in the first place. Rather, the court properly considered son's best interests in weighing whether severing his relationship with mother—a generally positive relationship that the court found to be more akin to a friendship than a parent-child bond—would outweigh the benefit of adoption by the caregivers, with whom son was

21

bonded and with whom he had lived for much of his young life. The court determined, on balance, maintaining the parent-child relationship did not outweigh the benefits of adoption. We do not read *Caden C.* as prohibiting this analysis. Indeed, *Caden C.* requires it. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 633, 638.)

## 2.  ICWA

### a.  *Applicable Law*

"[The] ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881–882; see also 25 U.S.C. § 1902.) For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either (1) a member of a federally recognized Indian tribe or (2) eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (See 25 U.S.C. § 1903(4) [definition of " 'Indian child' "] & (8) [definition of " 'Indian tribe' "]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

Under California law, the Department and the juvenile court "have an affirmative and continuing duty to inquire" into whether a dependent child "is or may be an Indian child." (§ 224.2, subd. (a); see also *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741–742.) " 'Following changes to the federal regulations concerning ICWA compliance, California made conforming amendments to its statutory scheme regarding ICWA, effective in 2019. [Citation.] . . . [T]he resulting clarification of law, found in part in section 224.2, "creates three

22

distinct duties regarding ICWA in dependency proceedings." ' "
(*In re H.V.* (2022) 75 Cal.App.5th 433, 437.)  The first duty—an
initial duty of inquiry—is at issue here.

The initial duty of inquiry requires " 'from the
[Department's] initial contact with a minor and his family, . . . a
duty of inquiry to ask all involved persons whether the child may
be an Indian child.  (§ 224.2, subds. (a), (b).)' " (*In re H.V., supra,*
75 Cal.App.5th at p. 437.)  This includes the Department "asking
the child, parents, legal guardian, Indian custodian, extended
family members, others who have in interest in the child, and the
party reporting child abuse or neglect, whether the child is, or
may be, an Indian child" (§ 224.2, subd. (b); see also Cal. Rules of
Court, rule 5.481(a)(1)), as well as the juvenile court inquiring at
each party's first appearance in the proceedings whether he or
she knows or has reason to know that the child is an Indian child
(§ 224.2, subd. (c); see also Cal. Rules of Court, rule 5.481(a)(2)).
Further inquiry and notice to the tribes (i.e., the second and third
ICWA duties) may be required only if there is "reason to believe"
or "reason to know" that the child is an Indian child based upon
this initial inquiry.  (§ 224.2, subds. (d), (e) & (f); 25 C.F.R.
§ 23.107(c) (2019).)  These further inquiry and notice
requirements are not at issue here.

### b.    *Standard of Review*

"We review claims of inadequate inquiry into a child's
Indian ancestry for substantial evidence." (*In re H.V., supra*, 75
Cal.App.5th at p. 438.)  Where the facts are undisputed, we must
independently determine whether ICWA's requirements have
been satisfied.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

23

### c. *The Department's deficient initial inquiry resulted in prejudicial error.*

The Department did not satisfy its initial inquiry obligation because it failed " 'to make a meaningful effort to . . . interview extended family members to obtain whatever information they may have as to the child's possible Indian status.' " (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1015.) Although the Department inquired of mother and father as to son's potential status as an Indian child, the Department did not ask the same of extended family members, such as maternal aunts, paternal grandmother, and paternal great grandmother, all of whom the Department had contact with during the underlying proceedings. (§ 224.2, subd. (b); see also Cal. Rules of Court, rule 5.481(a)(1).) To the extent the juvenile court inquired of paternal relatives who attended the initial detention hearing, that was insufficient because we do not know who those relatives were or whether they represent the whole of father's extended relatives whom the Department could contact. And of course, that in-court inquiry does not address mother's extended family members.

In light of the Department's failings in this regard, we must determine whether the juvenile court committed reversible error when, based on insufficient evidence, it held ICWA did not apply. The courts—including those within our Second District—are at odds over whether and when such an error is prejudicial and, therefore, reversible. As our colleagues in Division One recently noted, "appellate jurisprudence has adopted a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA ranging from a per se rule that any error is always prejudicial, to a test . . . finding no prejudice unless the appealing parent makes a proffer that interviewing

24

extended family members would yield information about potential Indian ancestry." (*In re A.C.*, *supra*, 75 Cal.App.5th at p. 1011.)

This case is similar to Division One's recent decision in *In re A.C.*, *supra*, 75 Cal.App.5th at page 1009, where the court found the Department's "failure to ask extended family members about potential Indian ancestry was prejudicial." (*Id.* at p. 1011.) Like the dependent children in *In re A.C.*, son was placed for a time during the underlying proceedings with extended family members. (*Id.* at p. 1015.) When the initial referral was made, son was in paternal grandmother's and paternal great grandmother's care and, later, was placed for months with a maternal aunt and uncle. Yet, in both cases the Department failed to ask those extended family members—who were readily available—about potential Indian child status. (*Ibid.*) Also, in both cases, "[t]he juvenile court merely relied on mother's and father's ICWA forms in concluding" the children were not Indian children. (*Ibid.*) Although the court here also inquired of unidentified paternal relatives at the detention hearing, as noted above, we find that insufficient. Finally, like the mother in *In re A.C.*, mother here "was the product of foster care and thus may not have known her cultural heritage. [Citation.] The same may not have been true of her biological relatives." (*Id.* at pp. 1015–1016.)

Thus, under the specific facts of this case, we conclude the Department's failure to satisfy its initial inquiry obligations and the juvenile court's reliance on the insufficient information resulted in prejudicial error. We acknowledge our conclusion is less than ideal in that it delays son's adoption and ultimate stability and permanency. However, this is a case where

25

extended family members, particularly on mother's side, may in fact have meaningful information as to a child's Indian ancestry that the child's parent might not have. As our Supreme Court has explained, "We are mindful of the child's need for a permanent and stable home, and we agree that swift and early resolution of ICWA notice issues is ideal. But the federal and state statutes were clearly written to protect the integrity and stability of Indian tribes despite the potential for delay in placing a child. The provisions of the California statute just discussed, as well as others, recognize the importance of properly determining a child's Indian status, even when a dependency proceeding has progressed beyond the initial stages." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 12; see also *In re A.C.*, *supra*, 75 Cal.App.5th at pp. 1016–1017.)

Accordingly, although we affirm the juvenile court's decision to terminate parental rights, we conclude the matter must be remanded so that proper ICWA inquiry may be made.

## DISPOSITION

The August 17, 2021 order is conditionally affirmed. We remand to the juvenile court for the Department and the court to comply with the inquiry provisions of ICWA and California law consistent with this opinion, including inquiring of the maternal extended family members. If the juvenile court determines after additional inquiry and a hearing that the Department has satisfied its inquiry obligations under ICWA and California law and there is no reason to believe son is an Indian child, the order terminating parental rights shall remain the order of the court. If after complying with the inquiry requirements of ICWA and California law, the Department or the court has reason to believe that son is an Indian child, the court shall vacate the order

26

terminating mother's and father's parental rights and proceed consistent with this opinion and the inquiry and notice provisions of ICWA and California law.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.

27